SEAN K. KENNEDY (No. 145632)
Federal Public Defender
(E-mail: Sean_Kennedy@fd.org)
MYRA SUN (No. 144190)
Deputy Federal Public Defender
(E-mail: myra_sun@fd.org)
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone (213) 894-2918
Facsimile (213) 894-0081

Attorneys for Defendant
BYRON ONG

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>    v.<br><br>BYRON ONG,<br><br>           Defendant. | NO. CR 02-252-RHW<br><br>DEFENDANT'S SENTENCING MEMORANDUM<br><br>Hearing Date: 5-15-08<br>Hearing Time: 11:00 a.m. |

Defendant Byron Ong, by and through his attorney of record, Deputy Federal Public Defender Myra Sun, submits the attached Sentencing Memorandum for the Court's consideration at the dispositional hearing scheduled for May 15, 2008.

 

                                                    Respectfully submitted,

                                                    SEAN K. KENNEDY
                                                    Federal Public Defender

DATED: May 13, 2008               By    /s/ Myra Sun
                                                    MYRA SUN
                                                    Deputy Federal Public Defender

## DEFENDANT'S SENTENCING MEMORANDUM

### I.

### INTRODUCTION

Byron Ong began a three-year term of supervised release in this case on July 15, 2004. He is alleged, in a violation petition filed December 20, 2005, to have accessed the Internet without Probation Office approval; to have used computers with on-line access without Probation Office approval; and, in a third allegation to be added, to have viewed child pornography.

Mr. Ong was arrested on February 15, 2006, 27 months ago. In that time period, he was on bond -- albeit a highly restrictive bond at a community corrections center -- for approximately 11 months. His total time spent in custody at this point is approximately 16 months. The goal of the CCC placement was to permit him to obtain medical treatment for a knee injury he suffered during his original term in custody, when he fell from a top bunk. The Court will see when he appears in court that he walks with a cane.

While Mr. Ong was in the community corrections center, he made some progress in his medical treatment, but was not completely successful. He also continued to attend mental health treatment through the Probation Office contractor, and felt that he had achieved a helpful rapport with therapists there. He thrives best with one-on-one counseling, as his letter to the Court notes.

On November 16, 2007, Mr. Ong returned to custody, where he has remained since then. This occurred after he left the community corrections center without permission on November 4, when medical records indicate that he went to a nearby bus stop, where he essentially fainted. A bus driver called for medical assistance, and he was taken to a local hospital, County-U.S.C. Medical Center. There, he was treated overnight and released based on alcohol usage. Laboratory tests indicated that he was negative for other drugs of abuse. When he was returned to the CCC, he tested positively for morphine, which the hospital did give to him. On November 6,

Mr. Ong entered the hospital again for treatment for his knee. Since then, he has remained in custody at the Metropolitan Detention Center. His mobility is restricted due to his knee injury.

## II.

## THE COURT SHOULD IMPOSE A TIME-SERVED SENTENCE.

The government has indicated that if Mr. Ong admits these allegations, it will forbear a new prosecution for the conduct in the third allegation. It will ask for the maximum sentence. The defense will request a sentence of time-served. As noted above, his time in custody is now at approximately 16 months. The maximum penalty that a court may impose for a violation of supervised release is two years when the underlying conviction is a Class C felony, as Mr. Ong's conviction is. *See* 18 U.S.C. §3583(e)(3).

### A. Applicable Law.

Title 18 U.S.C. §3583(e) lists factors to guide courts in imposing supervised release violation sentences, enumerating most of those in 18 U.S.C. §3553(a), the statute governing the initial imposition of sentence: the nature and circumstances of the offense[1] and the defendant's history and characteristics; deterrence; protection of the public; the defendant's need for treatment; the kinds of sentences available; the guideline range for violations and the guideline policy statements (here, a maximum of 24 months); the need to avoid unwarranted sentencing disparities among similarly situated defendants; and restitution (not applicable here). *See also United States v. Miqbel*, 444 F.3d 1173, 1181 (9th Cir. 2006). The "just deserts" and "promotion of respect for the law" sentencing factors in §3553(a)(2)(A) were specifically omitted. More or less in lieu of them, however, a court may properly consider a defendant's violation of court-ordered conditions, an inherent breach of the "trust" placed in him

---

[1] However, the "nature and circumstances of the offense" at the time of a violation sentencing do not refer to the original offense for which a person is under supervision. That conduct is to be taken into account "to a limited degree," in the context of his or her previous criminal history. *United States v. Simtob*, 485 F.3d 1058, 1062 (9th Cir. 2007).

3

by the court imposing the supervised release. *Miqbel*, 444 F.3d at 1182.

B.   The Appropriate Sentence.

1.   Nature and Circumstances of Offense; Defendant History and Characteristics

Mr. Ong, who is not a large person to begin with, has a knee injury that seriously hinders his physical mobility. Given the nature of his offense -- which, as his letter reflects, became known while he was in custody before -- he is at risk of assault, or of being punished more severely for his "protection" by placement in segregation. Extreme vulnerability to physical harm in prison was at one time recognized under the formerly-mandatory guidelines a proper ground for a downward departure. *Koon v. United States*, 116 S.Ct. 2035, 2053 (1996); *United States v. Graham*, 83 F.3d 1466, 1481 (D.C. Cir. 1996); *United States v. Tucker*, 986 F.2d 278, 280 (8th Cir. 1993); *United States v. Lara*, 905 F.2d 599, 605 92d Cir. 1990). Notwithstanding that the now-advisory sentencing guidelines discourage reductions based on this ground, it is now clear that the Court should consider it under §3553(a). It certainly goes to both the nature of Mr. Ong's past and current criminal offenses and his history and characteristics. The Court has his own account of the difficulties he has experienced while in prison before; that this risk exists cannot be doubted.

2.   Deterrence and Breach of Court's Trust

There is no question that Mr. Ong's conduct was a serious breach of the Court's trust. He recognizes that one function of the sentence here will be to deter him. However, as in all cases under the Sentencing Reform Act, the overarching consideration is whether a sentence is sufficient, and not greater than necessary, to achieve sentencing goals. 18 U.S.C. §3553(a), *Kimbrough v. United States*, 128 S.Ct. 558, 575 (2007).

3.   Protection of the Public/Treatment Needs

Mr. Ong recognizes that this factor, too, will be a major consideration for the Court. However, he points to his moderate progress in treatment, which is the

4

primary way by which he can manage his mental illness, and in turn is the primary way that the public can be protected.

4. <u>Guideline Range/Avoidance of Unwarranted Sentencing Disparities</u>

As noted above, the guideline range here is 12-18 months. The statutory maximum sentence here would be 24 months. If the Court imposed a time-served sentence, as requested, Mr. Ong would in fact serve essentially an 18-month sentence.

## III.
## CONCLUSION

Mr. Ong requests a time-served sentence.

Respectfully submitted,

SEAN K. KENNEDY
Federal Public Defender

DATED: May 14, 2008      By _____
MYRA SUN
Deputy Federal Public Defender

Dear Honorable Judge Robert H. Whaley,

Hello there. How are you today? I hope this letter reaches you in good health. As for me, I am more or less okay. I would just like to take a moment of your time to explain my behavior since I served my first sentence from this District Court.

When I was released from Taft Correctional Institution ("TCI"), I carried a lot of bitterness within me. To some extent, it is safe to say that the time I spent at TCI is a traumatizing event in my life and it is still affecting me to this day. It has been difficult for me throughout this whole ordeal because, first of all, at the time, it was shocking for me to receive a 33-month sentence. That was my very first encounter with the judicial system ever. And I had many of the prison life stereotypes stuck in my head. Nightmares of getting beat up or raped or even killed, compliments of movies!

Second, not too long after my cover was blown did I start getting attacked and tormented. Other inmates discovered my offense through a paper leak. An inmate handed job / the assistant/errand person ("worker") of the unit counselor. Too much paperwork, sensitive or not, goes through the "worker's" hands unsealed. The unit team plainly do not have a bulletproof system to keep all sensitive paperwork from getting into the wrong hands. Checking myself into Protective Custody ("PC") was not in my best interest because there was no unit or section exclusively for PC inmates. They were mixed in with the inmates in Administrative Segregation ("Hole") and I was horrified of the thought of being locked in a cell in the "Hole" with an inmate with such hatred for my kind of offense. I felt that I had a better chance of survival in General Population ("GP"), especially after I got insured. In "GP" there was no cells and had cubicles with no doors instead. Within the unit, chairs, brooms, mops, and dust pans are readily available. As needed, I could grab myself one, whether it is for cleaning or for protecting myself. Until I was released, I was unable to fully sleep comfortably because being with no locked doors has its disadvantages. Anybody alone or as a group, could come to attack while I was asleep.

Next, the medical staff at "TCI" expressed their utmost indifference towards my injuries and muscles. I was denied any and all medical treatment and/or attention. They refused to even give me a cane, crutches, walker, wheelchair, knee brace, lower bunk restriction, and/or work restriction. It took me roughly 20-30 minutes to get to and from the chow hall and unit when it only took me 3-4 minutes before my injury. Everytime I was assigned an upper bunk, I was forced to put my mattress on the floor because I could not climb. Several times I was given incident reports for refusing to work, which disrupted my privileges here and there. I was not released for roughly 1 year, 10 months, 3 weeks after I got injured. And for the duration of my stay at "TCI", the medical staff refused to treat me or transfer me to another facility that is better equipped to resolve my medical situation. That and practically my entire incarceration made me so bitter inside. The judicial system, the inmates, the private company's staff all punished me. At least that is how I felt.

Then, after my release from "TCI" came the pressures of supervised release. It was very hard for me to make all of my appointments because of insufficient public transportation in and around Granada Hills. When I first started attending group counseling at Sharper Future ("SF"), my group met in the 8th branch at 8am on Tuesdays, Wednesdays, and Thursdays every week of the year. The big problem was that I had to leave home at 5am and take 4 different buses just to get there, 2 of which were in Granada Hills and San Fernando. There was no earlier trip and only scheduled at 50-65 minute intervals. If either of the first 2 buses arrived late or pulls a no show, then it made it impossible for me to make it by 8am. That played a big role on why my group participation/performance was so poor. On September of 2005, "SF" started an evening group. The first chance that I got, I asked to be transferred to that group. It relieved the stress of not being able to make it there on time, but on the other hand, it was not guaranteed I was going to make it all the way back to Granada Hills by bus. The evening group was from 6pm to 7:30pm. I chose getting to "SF" on time over getting home because I can be late getting home even if I had to walk for a few hours just to get home. At least none of the conditions would have been violated.

When I was placed at Gateway RRC, my commute to "SF" was reduced by more than half, not including going up and down the hill to get to and from the bus stop. I was in a group that met every Tuesday only instead of 3x/week. The group facilitator set up my individual sessions once a week also before group, that really helped me because it's easier for me to open up to just the person in front of me over a group, so basically I prepared myself while I was in the individual session before I went to group. All that contributed to the overtly significant improvement in my participation/performance at the group meetings.

I know I am no perfect angel, nor would I make a good role model for anyone, but I just want to say that I have been through a lot, and even still I am making mistakes left and right. Not of that nor anything else in this world could excuse my behavior. I am sending out my sincerest apologies for everything, to anyone and everyone that has been affected by all my actions, including my family. Please bear with me, for I am only human, and I ask for your leniency as well as your mercy.

Respectfully yours,

Byron Ong
21059-112